THIRD DIVISION
September 28, 2007

Nos. 1-06-2428 and 1-06-2968 Consolidated

| | | |
|---|---|---|
| JERRI BLOUNT, | ) | Appeal from |
| | ) | the Circuit Court |
| Plaintiff-Appellee, | ) | of Cook County. |
| | ) | |
| v. | ) | |
| | ) | No. 01 L 2330 |
| JOSEPH STROUD, an Individual, and JOVON | ) | |
| BROADCASTING, WJYS-TV 62/34, an Illinois | ) | |
| Corporation, | ) | Honorable |
| | ) | Allen Goldberg, |
| Defendants-Appellants. | ) | Judge Presiding. |

JUSTICE THEIS delivered the opinion of the court:

Following a jury trial, defendants Jovon Broadcasting and Joseph Stroud, the owner and operational manager of Jovon Broadcasting, were found liable for "retaliation" against plaintiff Jerri Blount, a former employee of Jovon Broadcasting. The jury awarded plaintiff a total of $3,082,350 in damages, which was comprised of $257,350 for back pay, $25,000 for physical and/or emotional pain and suffering, and $2,800,000 in punitive damages. On appeal, defendants contend that: (1) the trial court erred in denying their motion for judgment notwithstanding the verdict because plaintiff's retaliation claim was preemempted by the Illinois Human Rights Act (775 ILCS 5/1-101 *et seq.* (West 2006)); (2) the trial court erred in denying their motion for judgment notwithstanding the verdict because plaintiff failed to prove her retaliation claim; (3) the trial court erred in awarding plaintiff attorney fees; (4) the trial court erred in submitting plaintiff's

request for punitive damages to the jury; (5) the jury's award of $2,800,000 in punitive damages is excessive; and (6) the trial court erred in denying defendants' motion for a new trial where errors committed during the trial unfairly prejudiced defendants and tainted the jury's verdict. Because we find that the circuit court lacked the subject matter jurisdiction to entertain plaintiff's claim under section 8-111(C) of the Human Rights Act (775 ILCS 5/8-111(C) (West 2006)), we reverse.

The record discloses the following facts and procedural history relevant to this appeal. Plaintiff commenced this action by filing a complaint against defendants on February 23, 2001, which alleged, *inter alia*, common law claims for retaliatory discharge, defamation, and intentional infliction of emotional distress. Specifically, plaintiff alleged that another Jovon employee, Bonnie Fouts, had filed a charge with the Equal Employment Opportunity Commission (EEOC) in which Fouts claimed that she was the victim of racial and sexual harassment. Plaintiff claimed that she was discharged from Jovon on October 19, 2000, in retaliation for the fact that she "sided with" Fouts by agreeing to testify on her behalf. Plaintiff claimed that this retaliation was actionable under the common law tort of retaliatory discharge and under section 1981 of the Civil Rights Act of 1991 (42 U.S.C. §1981 (2000)).

Defendants filed a motion to dismiss plaintiff's complaint pursuant to section 2-619 of the Code of Civil Procedure (735 ILCS 5/2-619 (West 2006)), alleging, *inter alia*, that plaintiff's allegations were not cognizable as an action for retaliatory discharge under section 1981. Defendants also maintained that the Human Rights Act preempted both of plaintiff's retaliatory discharge claims.

1-06-2428 & 1-06-2928 Consolidated

The circuit court denied this motion to dismiss, finding that plaintiff's retaliation claims were not "inextricably linked" with claims covered by the Human Rights Act. The court found that plaintiff's claims were not based on allegations that she was retaliated against because of her race but, rather, because she refused to commit perjury and supported Fouts in her racial and sexual harassment suit. The court explained that plaintiff's refusal to perjure herself was a refusal to commit a criminal act, which placed her allegations within the scope of the traditional common law tort of retaliatory discharge as outlined by the supreme court in Palmateer v. International Harvester Co., 85 Ill. 2d 124, 421 N.E.2d 876 (1981).

On the eve of trial, plaintiff amended her complaint. Therein, plaintiff, an African-American woman, alleged that she was employed by Jovon from 1993 until October 2000, when she was terminated. At the time of her termination, plaintiff was the local programming time sales manager. Stroud, who is also African-American, owned Jovon and managed all of its operations. Fouts is a Caucasian-American who filed a charge of discrimination with the EEOC and, after being given the right to sue by the EEOC, filed a lawsuit in the United States District Court alleging that she was the victim of racial discrimination and sexual harassment. Plaintiff witnessed the racial discrimination and sexual harassment of Fouts and agreed to testify on Fouts' behalf.[1]

In count III of her complaint, plaintiff alleged that defendants retaliated against her in violation of section 1981 of the Civil Rights Act when they harassed her, intimidated her, and terminated her employment because she agreed to support Fouts and agreed to testify on her behalf. Plaintiff alleged that these actions of defendants interfered with her "at will employment

_____

[1]Fouts ultimately settled her case against defendants.

3

contract," and were a violation of section 1981. In count V, plaintiff alleged that she was wrongfully terminated by Jovon in violation of Illinois public policy for her refusal to perjure herself in Fouts' case to protect defendants. Plaintiff also asserted claims for defamation and intentional infliction of emotional distress against both defendants.

Subsequently, the court conducted a jury trial of plaintiff's claims of retaliation, defamation, and intentional infliction of emotional distress. Because we will not address the sufficiency of the evidence to support the jury's verdict in this appeal, we will merely summarize the evidence presented.

Stroud testified as an adverse witness that he and his wife are the sole shareholders of Jovon, which is a small television broadcasting corporation. Jovon's station is WJYS, Channel 62. WJYS broadcasts primarily religious programs, infomercials, and other advertisements. WJYS also broadcasts community-based programs and local ministry programs. Stroud insisted that Jovon is a diverse workplace that is not operated on a racial basis.

Plaintiff testified that Stroud hired her to work at Jovon as a program screener in 1993. After several years, Stroud ultimately promoted plaintiff to the sales department. There, plaintiff was responsible for selling air time to infomercial broadcasters. In addition to her salary, plaintiff was paid a commission on accounts she brought to the station based on how much air time she sold them. In May 2000, Stroud made plaintiff his local sales manager, which meant that at least four other sales representatives reported to her. At that time, plaintiff was Jovon's "best" salesperson, generating approximately $2 to $3 million in revenue for WJYS annually. During this time, Jovon paid plaintiff roughly $250,000 a year.

Bonnie Fouts testified that she began working at WJYS in March of 1999. She began in the traffic department, which monitors broadcasts to make sure that the correct programming is being aired at the correct times. In January 2000, Rick Howell, who was the only other employee in the traffic department at the time, began to act in a "hostile" manner toward Fouts. He made inappropriate comments to her, calling her racial and sexual epithets. When Fouts asked Howell to stop addressing her in that manner, Howell told her that he was her manager and that he could speak to her in any way he wished.

Fouts informed Stroud of Howell's behavior. Stroud initially offered Fouts money for her "pain and suffering and anguish." Fouts told Stroud that she did not want money; she wanted the harassment to stop. In April of 2000, Stroud moved Fouts to another department at Jovon, but the harassment did not stop. Fouts had several more discussions with Stroud about Howell's behavior. Fouts also began sending Stroud letters requesting that he do something about Howell's treatment of her, which Stroud admitted that he received. However, Stroud never discharged or disciplined Howell.

Stroud terminated Fouts' employment on August 24, 2000. Fouts felt that she was fired from a job that she "really liked" because she was being racially and sexually harassed and she reported that harassment. Fouts subsequently filed a charge of race and sex discrimination with the EEOC.

On October 13, 2000, Stroud received notice of Fouts' EEOC charge. Stroud called a meeting of managers the same day. At that meeting, plaintiff indicated that she would be "supporting" Fouts in her charge of racial and sexual discrimination. Stroud admitted that he

responded to plaintiff by stating that he did not understand "how a black person could side with a white person against a black person." Stroud also admitted that he stated that Fouts had placed the jobs of everyone at Jovon at risk by filing the EEOC charge.

Rick Howell testified that the charges levied by Fouts were "fictitious." He also denied that Stroud ever said anything about a "black person siding with a white person" at the meeting. He maintained that Fouts was treated well by everyone at Jovon, but she "played the race card."

After the meeting, plaintiff went for a walk with Stroud to discuss her involvement in the Fouts matter. Stroud denied that he ever told plaintiff to lie about what happened with Fouts, and plaintiff never testified that Stroud asked her to lie. Rather, plaintiff stated that he asked her what she was "going to say in regards to Bonnie [Fouts]," to which plaintiff responded that she would not lie. Plaintiff also admonished Stroud for having witnessed the harassment of Fouts and having done nothing. Plaintiff testified that this made Stroud "irate." According to plaintiff, Stroud then told her that she needed to know who she was "up against," asserting that he was a wealthy businessman with powerful connections. Plaintiff became frightened of Stroud based on these comments.

However, Stroud denied threatening plaintiff. Rather, Stroud believed that the actions by Fouts and plaintiff were a conspiracy to extort money from the station. Stroud also felt that plaintiff "betrayed" him, which made him "very angry."

Six days after receiving Fouts' charge, Stroud made the decision to suspend plaintiff's employment. Stroud explained that he made this decision because Rick Howell, who was also his nephew, told him that plaintiff went around the station telling people that it was "hers." Stroud

also said that Ted France, another sales person, advised him that plaintiff had directed business to a competitor. However, Stroud admitted that he did not have proof that plaintiff diverted business. Stroud also believed that plaintiff did not have respect for him and that she was not organized. Subsequent to plaintiff's suspension, Stroud made the decision to terminate her. Plaintiff never returned to work after her suspension, and Stroud never paid her any further wages.

Nevertheless, Stroud subsequently offered plaintiff the opportunity to return to work for him as an independent contractor. Stroud also asked plaintiff to "forget about the lawsuit." Stroud gave her a check for $10,000, which Stroud explained was for "future services." Plaintiff cashed the check because she believed she was due the money for sales commissions that she had not been paid prior to her termination. However, plaintiff did not return to work for Jovon.

Following the conclusion of the evidence, the court held a jury instruction conference. At that conference, plaintiff agreed to drop the section 1981 retaliation count against Stroud personally. Plaintiff's counsel explained that this meant both retaliation counts would be against Jovon only and added that the allegations to support the claims "overlapped." Thus, the parties agreed to reduce the two instructions that had been proposed on the retaliation claims to one instruction encompassing a single retaliation claim. Accordingly, the jury was given the following instruction on the retaliation claims at the conclusion of the trial:

"I am now going to give you the instructions relating to plaintiff's first claim in which plaintiff alleges that she was terminated by defendant, Jovon, in whole or in part in retaliation for her protected activities, including her refusal to

7

agree to commit perjury and her support of Ms. Fouts' claim of discrimination, and/or or [*sic*] opposing defendants' treatment of Ms. Fouts.

To succeed on this claim, plaintiff must prove by a preponderance of the evidence that her protected activity was a substantial or motivating factor in defendant, Jovon's, decision to terminate her employment."

Following deliberations, the jury returned a verdict in favor of plaintiff on her now unified retaliation claim and in favor of defendants on the defamation and intentional infliction of emotional distress claims. The verdict form for the retaliation claim asked, "Did Plaintiff Blount prove her claim against Defendant Jovon that her protected activity was a motivating factor in defendants' termination of her employment?" The jury circled "yes," and awarded plaintiff $257,350 in back pay and $25,000 in damages for physical and/or emotional pain and suffering. On a separate form, the jury found that plaintiff had proven she was entitled to punitive damages for the retaliation claim and awarded her $2.8 million in punitive damages against Jovon.

Defendants subsequently filed a posttrial motion, contending, *inter alia*, that they were entitled to a judgment notwithstanding the verdict because plaintiff's retaliation claim was preempted by the Human Rights Act. Defendants asserted that plaintiff's claim fell "squarely" within the Human Rights Act's definition of retaliation for opposing discrimination. Defendants further asserted that under this court's decision in <u>Corluka v. Bridgford Foods of Illinois</u>, 284 Ill. App. 3d 190, 671 N.E.2d 814 (1996), the Human Rights Act does apply to common law claims for retaliatory discharge. The circuit court ultimately rejected defendants' argument, finding that plaintiff's claims were not based on her race but, rather, on her unwillingness to perjure herself,

1-06-2428 & 1-06-2928 Consolidated

which is "more in line with the traditional torts of retaliatory discharge as outlined in [Palmateer]." Defendants subsequently filed this timely appeal.

Defendants first contend, once again, that the Human Rights Act preempted plaintiff's retaliation claim. Therefore, defendants maintain, the circuit court lacked subject matter jurisdiction to adjudicate plaintiff's claim and erred in denying their motion for judgment notwithstanding the verdict on those grounds. We agree.

A motion for judgment notwithstanding the verdict should be granted only when " 'all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors [a] movant that no contrary verdict based on that evidence could ever stand.' " York v. Rush-Presbyterian-St. Luke's Medical Center, 222 Ill. 2d 147, 178, 854 N.E.2d 635, 652 (2006), quoting Pedrick v. Peoria & Eastern R.R. Co., 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14 (1967). Put another way, "a motion for judgment [notwithstanding the verdict] presents 'a question of law as to whether, when all of the evidence is considered, together with all reasonable inferences from it in its aspect most favorable to the plaintiffs, there is a total failure or lack of evidence to prove any necessary element of the [plaintiff's] case.' " York, 222 Ill. 2d at 178, 854 N.E.2d at 652, quoting Merlo v. Public Service Co. of Illinois, 381 Ill. 300, 311, 45 N.E.2d 665, 672 (1942). We review a trial court's decision to deny a motion for judgment notwithstanding the verdict *de novo*. York, 222 Ill. 2d at 178, 854 N.E.2d 652. When the trial court has erroneously denied a motion for judgment notwithstanding the verdict, we will reverse the verdict without a remand. See Maple v. Gustafson, 151 Ill. 2d 445, 453, 603 N.E.2d 508, 512 (1992).

9

As we explained above, plaintiff here raised two retaliation claims: a common law retaliatory discharge claim and a retaliation claim based on section 1981 of the Civil Rights Act of 1991. However, at the conclusion of the trial, because the two claims "overlapped," plaintiff reduced these two separate claims into the single retaliation claim upon which the jury was instructed. The circuit court found that this unified retaliation claim is, in actuality, a common law retaliatory discharge claim and not a section 1981 retaliation claim. Treating plaintiff's claim as such, we first find that under the Human Rights Act, the circuit court lacked the subject matter jurisdiction to entertain it. Second, even if plaintiff's claim were cognizable as a section 1981 retaliation claim, we would also find that the circuit court lacked the subject matter jurisdiction to entertain it.

At common law and in Illinois today, a noncontract employee is one who serves at the employer's will, and the employer may discharge that employee for any or no reason. Zimmerman v. Buchheit of Sparta, Inc., 164 Ill. 2d 29, 32, 645 N.E.2d 877, 879 (1994). The common law tort of retaliatory discharge is a limited and narrow exception to this general rule of employment at will. Krum v. Chicago National League Ball Club, Inc., 365 Ill. App. 3d 785, 788, 851 N.E.2d 621, 624 (2006); Corluka v. Bridgford Foods of Illinois, 284 Ill. App. 3d 190, 192-93, 671 N.E.2d 814, 817 (1996). In recognizing the tort, the supreme court observed that the employer and the employee do not stand on equal footing and that an employer with unchecked power can present a distinct threat to public policy. Palmateer v. International Harvester Co., 85 Ill. 2d 124, 129, 421 N.E.2d 876, 878 (1981).

In order to state a claim for retaliatory discharge, a plaintiff must establish that she was (1)

10

discharged (2) in retaliation for her activities, and that (3) the discharge violates a clear mandate of public policy. Zimmerman, 164 Ill. 2d at 35, 645 N.E.2d at 880. However, because the common law tort of retaliatory discharge is an exception to the at-will employment doctrine, an employee who has a contract of employment for a fixed term may not bring a common law retaliatory discharge claim. Krum, 365 Ill. App. 3d at 789, 851 N.E.2d at 625.

The Human Rights Act was enacted to, among other things, prevent unlawful discrimination in employment. 775 ILCS 5/1-101 (West 2006). To that end, the Human Rights Act created a statutory cause of action for retaliation. Corluka, 284 Ill. App. 3d at 193, 671 N.E.2d at 817. Section 6-101 of the Human Rights Act explains that it is a "civil rights violation" for a person to "[r]etaliate against a person because he or she has opposed that which he or she reasonably and in good faith believes to be unlawful discrimination, sexual harassment in employment or sexual harassment in higher education, discrimination based on citizenship status in employment, or because he or she has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this Act." 775 ILCS 5/6-101(A) (West 2006).

The Human Rights Act also created the exclusive means for the redress of civil rights violations. Mein v. Masonite Corp., 109 Ill. 2d 1, 7, 485 N.E.2d 312, 315 (1985); Faulkner-King v. Department of Human Rights, 225 Ill. App. 3d 784, 793, 587 N.E.2d 599, 605 (1992). The Human Rights Act specifically provides that "[e]xcept as otherwise provided by law, no court of this state shall have jurisdiction over the subject of an alleged civil rights violation other than as set forth in this Act." 775 ILCS 5/8-111(C) (West 2006). In enacting this provision, the

11

legislature intended to eliminate direct access to Illinois courts for the redress of civil rights violations. See <u>Mein</u>, 109 Ill. 2d at 7, 485 N.E.2d at 315, citing 81st Ill. Gen. Assem., Transcript of House Proceedings, June 22, 1979, at 133, 146, June 25, 1979, at 87. Thus, if a common law tort claim is, in essence, one that seeks redress for conduct that is inextricably linked to a civil rights violation as defined by the Human Rights Act, then the circuit court lacks subject matter jurisdiction to entertain the tort claim. <u>Maksimovic v. Tsogalis</u>, 177 Ill. 2d 511, 517, 687 N.E.2d 21, 23 (1997). In other words, the Human Rights Act will preempt such tort claims unless the plaintiff can establish the necessary elements of the tort without reference to any legal duties created by the Human Rights Act. <u>Maksimovic</u>, 177 Ill. 2d at 519, 687 N.E.2d at 24.

In the present case, plaintiff's retaliation claim was based on her protected activities of refusing to commit perjury and "supporting" Fouts' racial and sexual harassment suit. However, the evidence adduced at trial does not support her allegation that she refused to commit perjury. Stroud testified that he never asked plaintiff to lie under oath about the Fouts matter, and plaintiff also admits that he never actually asked her to lie. Rather, plaintiff asserted that she would not lie after Stroud asked her what she was going to say about what happened to Fouts. Thus, the only protected activity that the jury could have found to satisfy plaintiff's claim of retaliatory discharge was that plaintiff "supported" Fouts' claim. Such a claim is identical to the definition of a claim for retaliation under section 6-101(A) of the Human Rights Act. 775 ILCS 5/6-101(A) (West 2006). Therefore, plaintiff's retaliation claim, treated as a common law claim for retaliatory discharge, is preempted by the Human Rights Act. See, <u>e.g.</u>, <u>Corluka</u>, 284 Ill. App. 3d at 194, 671 N.E.2d at 817 (finding common law claim for retaliatory discharge based on protected

12

activity of reporting the sexual harassment of another employee was preempted by the Human Rights Act); Quantock v. Shared Marketing Services, Inc., 312 F.3d 899, 905 (7th Cir. 2002) (finding common law tort claim for intentional infliction of emotional distress based on the same allegations as a Title VII sexual harassment claim was preempted by the Human Rights Act).

Additionally, before the case was submitted to the jury, plaintiff described her common law and section 1981 retaliation claims as "overlapping." Indeed, both claims were based substantially on plaintiff's "support" for Fouts' suit and the fact that plaintiff had agreed to testify for Fouts that she witnessed Howell racially and sexually harass her. As a result, plaintiff cannot establish either of her retaliation claims without reference to the legal duty created by the Human Rights Act that an employer cannot retaliate against an employee because the employee "opposed that which he or she reasonably and in good faith believed to be unlawful discrimination, [and/or] sexual harassment in employment" (775 ILCS 5/6-101(A) (West 2006)). Maksimovic, 177 Ill. 2d at 517, 687 N.E.2d at 23. Thus, plaintiff's retaliation claims are "inextricably linked" and both are preempted by the Human Rights Act. Accordingly, the circuit court lacked subject matter jurisdiction to adjudicate the claim and erred in denying defendants' motion for judgment notwithstanding the verdict on these grounds. See Corluka, 284 Ill. App. 3d at 194, 671 N.E.2d at 817.

Further, even if we were to treat plaintiff's retaliation claim strictly as a section 1981 claim, it would not change this result. Section 1981 guarantees that all people within the United States have the same right as "white citizens" in every state and territory to make and enforce contracts. 42 U.S.C. §1981 (2000); see also Domino's Pizza, Inc. v. McDonald, 546 U.S. 470,

474, 163 L. Ed. 2d 1069, 1075, 126 S. Ct. 1246, 1249 (2006) (discussing section 1981). Thus, in order to state a claim under section 1981, a plaintiff must establish proof of a contractual relationship or a would-be contractual relationship. McDonald, 546 U.S. at 476, 163 L. Ed. 2d at 1075-76, 126 S. Ct. at 1249-50. Although at-will employees lack a fixed duration of employment, there are nevertheless contractual aspects to an at-will employment relationship, such as wages, benefits, duties, and working conditions. Walker v. Abbott Laboratories, 340 F.3d 471, 476-77 (7th Cir. 2003). Thus, the protections of section 1981 also apply in the context of an at-will employment relationship. Walker, 340 F.3d at 477.

In addition, although section 1981 does not mention retaliation, the majority of the United States Courts of Appeal have concluded that section 1981, as amended by the Civil Rights Act of 1991, provides an avenue of recourse for individuals who have suffered retaliation for advocating the rights of those protected under section 1981. Humphries v. CBOCS West, Inc., 474 F.3d 387, 401 (7th Cir. 2007), citing Foley v. University of Houston System, 355 F.3d 333, 339 (5th Cir. 2003), Hawkins v. 1115 Legal Service Care, 163 F.3d 684, 693 (2d Cir. 1998), Andrews v. Lakeshore Rehabilitation Hospital, 140 F.3d 1405, 1412-13 (11th Cir. 1998), and Barge v. Anheuser-Busch, Inc., 87 F.3d 256, 259 (8th Cir. 1996); see also Carney v. American University, 151 F.3d 1090, 1094-95 (D.C. Cir. 1998) (assuming, without a discussion of the issue, that section 1981 encompasses retaliation claims). But see Humphries, 474 F.3d at 411 (Easterbrook, J., dissenting) (concluding that "section 1981 does not offer one opening for a claim in the nature of retaliatory discharge"); Little v. United Technologies, Carrier Transicold Division, 103 F.3d 956, 961 (11th Cir. 1997) (concluding that because section 1981 is different from Title VII, the

type of discrimination it proscribes must be different and holding that section 1981 does not encompass retaliation claims). Also, despite the language of section 1981, a "white citizen" can sue under the section where she has been discriminated against in favor of a racial minority. McDonald v. Santa Fe Trail Transportation Co., 427 U.S. 273, 286-87, 49 L. Ed. 2d 493, 504, 96 S. Ct. 2574, 2582 (1976). Thus, Fouts is a person protected under section 1981, and, under the view espoused by the majority of the federal courts of appeal, it appears that plaintiff can state a claim under section 1981 based on retaliation she suffered because she advocated for Fouts' rights. However, we need not resolve this issue of federal law and decide whether plaintiff can actually state a claim for retaliation under section 1981.

Even if plaintiff's retaliation claim were cognizable under section 1981, the circuit court lacked subject matter jurisdiction to entertain the claim because the exclusivity of the remedy provided under the Human Rights Act also extends to claims of civil rights violations brought under federal law. Meehan v. Illinois Power Co., 347 Ill. App. 3d 761, 768, 808 N.E.2d 555, 563 (2004); Faulkner-King v. Wicks, 226 Ill. App. 3d 962, 970-71, 590 N.E.2d 511, 518 (1992); Cahoon v. Alton Packaging Corp., 148 Ill. App. 3d 480, 482, 499 N.E.2d 522, 523 (1986). As this court has previously observed, the United States Supreme Court has made clear that even though state courts are required to apply and enforce federal law as "the law of the land" in accordance with our system of federalism, states are not required to create courts of competent jurisdiction to hear cases in which federal claims are presented. Howlett v. Rose, 496 U.S. 356, 372-73, 110 L. Ed. 2d 332, 350-51, 110 S. Ct. 2430, 2441 (1990); First Capital Mortgage Corp. v. Union Federal Bank, 374 Ill. App. 3d 739, 740-41, 872 N.E.2d 84, 85-86 (2007); Meehan, 347

1-06-2428 & 1-06-2928 Consolidated

Ill. App. 3d at 765-66, 808 N.E.2d at 561; Faulkner-King, 226 Ill. App. 3d at 970, 590 N.E.2d at 518. Rather, federal law " 'takes the state courts as it finds them.' " Howlett, 496 U.S. at 372, 110 L. Ed. 2d at 351, 110 S. Ct. at 2441, quoting H. Hart, The Relations Between State and Federal Law, 54 Colum. L. Rev. 489, 508 (1954). This is because states have "great latitude" to establish the structure and jurisdiction of their own courts. Howlett, 496 U.S. at 372, 110 L. Ed. 2d at 350-51, 110 S. Ct. at 2441. In other words, Congress cannot require that a state create a court of competent jurisdiction to enforce the laws that it enacts. See Howlett, 496 U.S. at 378, 110 L. Ed. 2d at 354-55, 110 S. Ct. at 2444. Thus, states may apply their own neutral procedural rules to federal claims unless those rules discriminate against federal law. Howlett, 496 U.S. at 372, 110 L. Ed. 2d at 351, 110 S. Ct. at 2441, citing Felder v. Casey, 487 U.S. 131, 101 L. Ed. 2d 123, 108 S. Ct. 2302 (1988); see also First Capital Mortgage, 374 Ill. App. 3d at 742, 872 N.E.2d at 85-86.

A rule need not be "monolithic" to be neutral. Johnson v. Fankell, 520 U.S. 911, 918 n.9, 138 L. Ed. 2d 108, 117, 117 S. Ct. 1800, 1804 n.9 (1997) (distinguishing Felder). Generally, state law principles of jurisdiction and venue that prohibit a state court from entertaining certain types of claims, which also happen to prohibit the state court from entertaining certain federal claims, are considered neutral. First Capital Mortgage, 374 Ill. App. 3d at 742, 872 N.E.2d at 86; see also Johnson, 520 U.S. at 918-19, 138 L. Ed. 2d at 116-17, 117 S. Ct. at 1805; Howlett, 496 U.S. at 374-75, 110 L. Ed. 2d at 352, 110 S. Ct. at 2442, discussing Douglas v. New York, N.H. & H.R. Co., 279 U.S. 377, 73 L. Ed. 747, 49 S. Ct. 355 (1929) (permitting dismissal where state statute permitted discretionary dismissal of both federal and state claims where neither the plaintiff

16

nor the defendant was a resident of the state), Herb v. Pitcairn, 324 U.S. 117, 89 L. Ed. 789, 65 S. Ct. 459 (1945) (permitting dismissal for lack of jurisdiction on the grounds that the controversy arose outside of territorial jurisdiction), and Missouri ex rel. Southern Ry. Co. v. Mayfield, 340 U.S. 1, 95 L. Ed. 3, 71 S. Ct. 1 (1950) (permitting state court's dismissal of federal claim based on *forum non conveniens*). For example, in Johnson, the Supreme Court found an Idaho appellate rule limiting interlocutory appeals to only certain very limited circumstances, which did not include claims under section 1983 of the Civil Rights Act, was neutral and not preempted by federal law that would have permitted an interlocutory appeal in those circumstances. Johnson, 520 U.S. at 918-19, 138 L. Ed. 2d at 116-17, 117 S. Ct. at 1804-05. In so holding, the Supreme Court distinguished Felder, explaining that there was no evidence that the Idaho appellate rule sought to specifically discriminate against section 1983 claims as compared with other types of appeals. Johnson, 520 U.S. at 918 n.9, 138 L. Ed. 2d at 116 n.9, 117 S. Ct. at 1805 n.9. The court also recognized that the purpose of the Idaho appellate rule was to limit the types of cases in which the Idaho appellate court would entertain an interlocutory appeal, rather than to discriminate against civil rights claims against the state. Johnson, 520 U.S. at 918 n.9, 138 L. Ed. 2d at 117 n.9, 117 S. Ct. at 1805 n.9.

In contrast, state law is preempted where its purpose and effect is to discriminate against and to limit a federally conferred right. Felder, 487 U.S. at 144, 101 L. Ed. 2d at 141-42, 108 S. Ct. at 2310. For example, in Felder, the Supreme Court found a Wisconsin notice-of-claim statute which provided, *inter alia*, that before suit may be brought in state court against a state or local government entity, the plaintiff had to notify the defendant of the claim and the requested

17

relief, and give the defendant 120 days to grant or disallow the relief before the plaintiff could file suit in court, to be preempted by federal law. Felder, 487 U.S. at 136-137, 138, 101 L. Ed. 2d at 136-37, 138, 108 S. Ct. at 2305-06, 2307. This procedure was "manifestly inconsistent" with the purposes of section 1983 because it minimized governmental liability, discriminated against a governmental right, and forced claimants to seek satisfaction in the first instance from the government before a claimant could go to court. Felder, 487 U.S. at 141-42, 101 L. Ed. 2d at 139-40, 108 S. Ct. at 2308-09. The Court recognized:

> "Although it is true that the notice-of-claim statute does not discriminate between state and federal causes of action against local governments, the fact remains that the law's protection extends only to governmental defendants and thus conditions the right to bring suit against the very persons and entities Congress intended to subject to liability." Felder, 487 U.S. at 144-45, 101 L. Ed. 2d at 142, 108 S. Ct. at 2310.

Here, we find the Human Rights Act to be more like the jurisdictional rule in Johnson than the notice-of-claim statute in Felder, and agree with all other Illinois decisions that have considered this issue to find that the circuit court lacked the subject matter jurisdiction to entertain plaintiff's federal civil rights claim. As our supreme court explained in Mein, in enacting the Human Rights Act, the Illinois legislature intended to remove the power to try cases involving all types of civil rights violations from the jurisdiction of the Illinois circuit courts. Mein, 109 Ill. 2d at 7, 485 N.E.2d at 315. Illinois circuit courts now may entertain such claims only on administrative review. 775 ILCS 5/8-111(A) (West 2006); see also Mein, 109 Ill. 2d at 6, 485

18

N.E.2d at 315 (discussing the procedure for such claims, generally).

The House debates on the Human Rights Act reveal that the legislature's intent in enacting the exclusivity-of-remedy provision was to ensure that individuals with civil rights claims receive "immediate relief" through an administrative body. 81st Ill. Gen. Assem., Transcript of House Proceedings, June 25, 1979, at 87. The legislature's intent was also to create one administrative body to adjudicate all types of civil rights claims, whether they arose under state or federal law. 81st Ill. Gen. Assem., Transcript of House Proceedings, June 25, 1979, at 87. The legislature's intent was not to shelter the government from suit. Significantly, the Human Rights Act applies not only to civil rights claims against the government, but to all types of civil rights violations, including those in which the defendant is a private entity. See 775 ILCS 5/1-101 (West 2006) (explaining the purpose of the Human Rights Act).

Because the Human Rights Act was intended to be so broad, all of the courts in Illinois to have considered the issue have held that Illinois circuit courts lack the subject matter jurisdiction to adjudicate civil rights claims brought under state and federal law. Meehan, 347 Ill. App. 3d at 768, 808 N.E.2d at 563 (claim under the Age Discrimination in Employment Act of 1967 (ADEA) (29 U.S.C. §621 et seq. (2000))); Brewer v. Board of Trustees of the University of Illinois, 339 Ill. App. 3d 1074, 1079-80, 791 N.E.2d 657, 661 (2003) (Title VII (42 U.S.C. §§2000e through 2000e-17 (2000)) racial discrimination, Americans with Disabilities Act (42 U.S.C. §§12111 through 12117 (2000)), section 1983, and retaliation claims); Cooper v. Illinois State University, 331 Ill. App. 3d 1094, 1100, 772 N.E.2d 396 (2002) (ADEA claim); Faulkner-King, 226 Ill. App. 3d at 970-71, 590 N.E.2d at 518 (claims under sections 1983, 1985, and 1986

of the Civil Rights Act); <u>Cahoon</u>, 148 Ill. App. 3d at 482, 499 N.E.2d at 523 (ADEA claim).

We find no reason to disagree with those decisions here. In enacting the Human Rights Act, the Illinois legislature chose to remove civil rights claims from the purview of circuit court jurisdiction. As the Supreme Court made clear in <u>Howlett</u>, Congress cannot now require that Illinois create a court to adjudicate civil rights claims brought under federal law. Further, as the Fifth District explained in <u>Meehan</u>, the Human Rights Act does not discriminate against federal law but, rather, treats federal and state claims alike. <u>Meehan</u>, 347 Ill. App. 3d at 767, 808 N.E.2d at 562. Indeed, to require that Illinois circuit courts, rather than the Illinois Human Rights Commission, hear cases involving civil rights violations that are brought under federal law would be to require state courts to give special treatment to federal claims. This is the converse of the scenario in <u>Howlett</u>, in which the Supreme Court held that the State of Florida could not apply sovereign immunity to section 1983 claims where it did not apply sovereign immunity to similar state law claims. <u>Howlett</u>, 496 U.S. at 378, 110 L. Ed. 2d at 354-55, 110 S. Ct. at 2444. Illinois circuit courts cannot be "compelled" to exercise jurisdiction over civil rights claims merely because they are brought "under the guise of federal authority." <u>Faulkner-King</u>, 226 Ill. App. 3d at 971, 590 N.E.2d at 518. We accordingly hold that the Human Rights Act deprives Illinois circuit courts of subject matter jurisdiction over all civil rights claims, regardless of whether they are brought under state or federal law. With respect to the Illinois court system, jurisdiction over all of plaintiff's claims exists only in the Illinois Human Rights Commission.[2] <u>Brewer</u>, 339 Ill.

---

[2]We must also note that on August 17, 2007, the Illinois General Assembly decided to change the Human Rights Act so that in the future, plaintiffs will have the opportunity to file their

20

1-06-2428 & 1-06-2928 Consolidated

App. 3d at 1085, 791 N.E.2d at 666.

In reaching this conclusion, we find the cases relied upon by plaintiff which hold that under Felder, a plaintiff need not exhaust administrative remedies before filing a civil rights claim in a state court distinguishable from the present case. Three of those cases involved public employees suing the government in its capacity as their employer, and the administrative schemes at issue in those cases required only public employees to resort to administrative remedies to sue the government. Smith v. Lorch, 730 So. 2d 530, 533 (La. App. 1999) (sanitarian working for Louisiana Department of Health and Hospitals); Roache v. District of Columbia, 654 A.2d 1283, 1284 (D.C. App. 1995) (police officer); Allen v. Bergman, 198 Ga. App. 57, 58, 400 S.E.2d 347, 348-49 (1990) (teacher). In a fourth case cited by plaintiff, the plaintiff was the victim of police brutality who sought to bring common law claims for assault and battery along with section 1983 and 1981 claims in state court, and the Colorado appellate court held that the fact that plaintiff had adequate state tort law remedies did not preclude him from also filing section 1981 and 1983 claims. Mosher v. City of Lakewood, 807 P.2d 1235, 1237 (Colo. App. 1991).

None of the cases cited by plaintiff involved a legislative scheme comparable to the Human Rights Act. Unlike the Human Rights Act, the administrative schemes in the government employee cases did not remove subject matter jurisdiction to entertain civil rights claims from the state courts. Rather, the administrative schemes in question provided special procedures when the

---

civil rights complaints either with the Human Rights Commission or in the circuit court. Pub. Act. 95-243, eff. January 1, 2008 (amending 775 ILCS 5/7A-102, 7A-103, 7B-102, 7B-103, 8-103, 8-110, 8-111 (West 2006)).

21

government was the defendant, which evinced that the purpose of those administrative schemes was clearly to shield the government from being taken to court. This is the very practice that the Supreme Court found to be unacceptable in Felder. Felder, 487 U.S. at 141, 101 L. Ed. 2d at 140, 108 S. Ct. at 2308. In addition, to the extent that Mosher held that the plaintiff could file federal claims instead of or without filing state tort law claims, we agree; however, that holding is not dispositive of the case at bar. Our holding is that the Illinois circuit courts lack the subject matter jurisdiction to entertain any civil rights claims, including those, such as the present one, in which the defendant is a private entity.

Thus, regardless of whether plaintiff's retaliation claim was an Illinois common law retaliatory discharge claim or a federal section 1981 claim, the circuit court lacked the subject matter jurisdiction to entertain it. Therefore, the circuit court erred in denying defendants' motion for judgment notwithstanding the verdict. Accordingly, we reverse the judgement of the circuit court of Cook County.

Reversed.

GREIMAN and CUNNINGHAM, JJ., concur.

JERRI BLOUNT,

      Plaintiff-Appellee,

      v.

JOSEPH STROUD, an Individual, and JOVON BROADCASTING, WJYS-TV 62/34, an Illinois Corporation,

      Defendants-Appellants,

### Nos. 1-06-2428 and 1-06-2968 Consolidated

**Appellate Court of Illinois**
**First District, Third Division**

**Filed: September 28, 2007**

### JUSTICE THEIS delivered the opinion of the court.

**Greiman and Cunningham, JJ., concur.**

**Appeal from the Circuit Court of Cook County**
**Honorable Allen Goldberg, Judge Presiding**

| | | |
|---|---|---|
| **For DEFENDANTS - APPELLANTS** | Walter Jones, Jr.<br>Linzey D. Jones<br>Tiffany M. Ferguson<br>Monica M. Millan<br>Pugh, Jones, Johnson & Quandt, P.C.<br>180 N. LaSalle St., Suite 3400<br>Chicago, IL 60601 | |
| **For PLAINTIFF - APPELLEE** | Robin B. Potter<br>Robin Potter & Associates, P.C.<br>111 E. Wacker Dr., Suite 2600<br>Chicago, IL 60601 | Martin A. Dolan<br>Dolan Law Offices, P.C.<br>10 S. LaSalle St., Suite 3710<br>Chicago, IL 60603 |